Adela S. HAGEN, Plaintiff-Appellant,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Hess Memorial Hospital Association, Inc., a Wisconsin Corporation, and Fire & Casualty Insurance Company of Connecticut, Respondents-Respondents.†

Court of Appeals

*No. 94–0374. Submitted on briefs September 14, 1994.—Decided March 14, 1996.*

(Also reported in 547 N.W.2d 812.)

†Petition to review granted.

For the plaintiff-appellant the cause was submitted on the briefs of *John R. Orton* of *Curran, Hollenbeck & Orton, S.C.* of Mauston.

For the respondents-respondents the cause was submitted on the brief of *Ronald S. Aplin* and *Frederick J. Smith* of *Peterson, Johnson & Murray, S.C.* of Milwaukee.

Amicus Curiae briefs were filed by *James R. Gorton* of *Denissen, Kranzush, Mahoney & Ewald, S.C.* of

Green Bay, for Civil Trial Counsel of Wisconsin and *Michael H. Gillick* of *Murphy, Gillick, Wicht & Prachthauser* of Milwaukee, for Wisconsin Academy of Trial Lawyers.

Before Eich, C.J., Sundby and Vergeront, JJ.

SUNDBY, J.   The Labor and Industry Review Commission's interpretation in this case of the permanent partial disability schedule, § 102.52(1), STATS.,[1] "ruptur[es] . . . the conceptual tidiness which is . . . the very essence of the scheduled-injury approach," *Lauhoff Grain Co. v. McIntosh*, 395 N.W.2d 834, 840 (Iowa 1986). We conclude that "[t]he loss of an arm at the shoulder," a "scheduled" injury, clearly and unambiguously does not include appellant's shoulder injury. However, we do agree with LIRC that "[t]he loss of an arm" includes impairment of the use of appellant's arm. We therefore reverse that part of the trial court's order affirming LIRC's decision that the shoulder injury was a "scheduled" injury, and affirm that part of the order affirming LIRC's decision that an arm injury is "scheduled."[2]

---

[1] Section 102.52(1), STATS., provides:

**Permanent partial disability schedule.** In cases included in the following schedule of permanent partial disabilities indemnity shall be paid for the healing period, and in addition, for the period specified, at the rate of two-thirds of the average weekly earnings of the employe to be computed as provided in s. 102.11:

(1)   *The loss of an arm at the shoulder*, 500 weeks . . . .

(Emphasis added.)

[2] Helpful non-party briefs have been filed by the Civil Trial Counsel of Wisconsin and the Wisconsin Academy of Trial Lawyers.

Appellant Adela S. Hagen's worker's compensation benefits are greatly affected by whether her injuries are "scheduled" or "unscheduled." A scheduled injury is compensated at a fixed rate calculated according to expected weeks of disability, regardless of what effect the injury may have upon the injured party's ability to earn a living. *See Mednicoff v. ILHR Dep't*, 54 Wis. 2d 7, 11-12, 194 N.W.2d 670, 672 (1972). However, unscheduled injuries may be compensated pursuant to a "loss of earning capacity" standard. *See id.*

Hagen presents two issues: (1) whether the injuries to both her arm and shoulder were unscheduled injuries not within the scope of Wisconsin's scheduled-injury system, § 102.52, STATS., and if not, (2) whether her shoulder injury was an unscheduled injury.[3]

## BACKGROUND

Hagen worked at Hess Memorial Hospital from 1979 to 1989 as a nurse's aide. On May 5, 1989, she was injured while lifting a patient from a wheelchair to a bed; as she lifted the patient, Hagen felt a pull in her right shoulder and arm. To treat the injury, she saw a number of physicians and underwent physical therapy. She also took medication, and eventually had surgery. Hagen filed her worker's compensation claim in February 1990.

---

[3] Hagen makes a third claim that her shoulder injury *at least* included an "unscheduled" component under *Wagner v. Industrial Comm'n*, 273 Wis. 553, 79 N.W.2d 264 (1956). Because we decide that Hagen's shoulder injury cannot be classified as a scheduled injury, we need not consider this argument. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559, 562 (Ct. App. 1983).

At the May 26, 1992 hearing before the administrative law judge (ALJ), Hagen testified that her injuries were significant. She complained of extreme tenderness in her upper right arm, upper right chest, right armpit, and the muscles surrounding her right shoulder and shoulder blade. She also complained of severe muscle spasms in her back. Hagen described the spasms as "a steady increase in tension in the back muscles . . . to a point where a painful 'knot' or 'ball' is created." Finally, Hagen complained of numbness in her right shoulder and arm, as well as tingling in her upper back.

Hagen's complaints are supported by medical testimony and evidence. Dr. James Logan testified that Hagen had a poor range of motion and pain in the right shoulder and bicep area. He also testified that, because of her injuries, Hagen's posture is not normal; indeed, Logan believes that Hagen may develop a scoliotic back.[4] Logan concluded that the entire shoulder muscle group complex represents the primary root of Hagen's pain.

Dr. Diana Kruse, who performed the surgery on Hagen's shoulder, prepared a WC-16-B report[5] which was received into evidence at the hearing. She stated in the report:

---

[4] A scoliotic back is characterized by a lateral curvature of the spine, usually consisting of two curves, the original abnormal curve and a compensating curve in the opposite direction. TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1765 (17th ed. 1993); see also THE SLOAN-DORLAND ANNOTATED MEDICAL-LEGAL DICTIONARY 633 (West 1987) ("[A]n appreciable lateral deviation in the normally straight vertical line of the spine.").

[5] A WC-16-B report is authorized by § 102.17(1)(d), STATS., as admissible in lieu of the physician's oral testimony.

> I agree with the 10 percent disability of the right
> upper extremity compared to four quarter amputa-
> tion submitted by Dr. M. Cunningham on the basis
> of daily pain, decreased ability to use right arm for
> pushing, pulling, lifting and decreased use of the
> arm at any position above the waist level. *I would
> award an additional 5 percent whole person disabil-
> ity on the basis of the myofascial pain in the upper
> and mid back area. This is related to the shoulder
> girdle muscle attachments to the trunk and abnor-
> mal muscle tension in the upper, mid and low back
> areas because of chronic pain that the patient
> experiences.*

(Emphasis added.)

The ALJ also noted that the employer's doctor, Dr. Panna Varia, reported: "I rate [Hagen's] permanent partial disability as 7 percent at the shoulder joint."

Notwithstanding all of the medical evidence, the ALJ classified Hagen's injuries as scheduled. LIRC adopted the ALJ's decision. In its memorandum opinion, LIRC concluded that § 102.52(1), STATS., and WIS. ADM. CODE § IND 80.32 mandated that Hagan's shoulder injury, as well as her arm injury, be classified as scheduled. We conclude that "[t]he loss of an arm at the shoulder" does not, as a matter of law, include Hagen's shoulder injury.

## STANDARD OF REVIEW

LIRC was required, as are we, to determine whether the legislature intended by scheduling "[t]he loss of an arm at the shoulder" to include injuries to parts of the body other than the arm. The interpretation of a statute presents a question of law which we decide *de novo. See Schachtner v. DILHR*, 144 Wis. 2d

56

1, 4, 422 N.W.2d 906, 907-08 (Ct. App. 1988). Moreover, whether a particular set of facts fulfills a statutory standard—the issue before us—is also a question of law which we review *de novo*. *See Lifedata Medical Servs. v. LIRC*, 192 Wis. 2d 663, 670, 531 N.W.2d 451, 454 (Ct. App. 1995).

In this case, LIRC's interpretation of the relevant statute and administrative rule "directly contravenes the words of the statute, [and] is . . . unreasonable [and] without rational basis." *Lisney v. LIRC*, 171 Wis. 2d 499, 506, 493 N.W.2d 14, 16 (1992). Moreover, where a statute is clear and unambiguous, "[o]nly the plain meaning of words in the normal sense, as used in the context of the statute, can be looked to." *Girouard v. Jackson Circuit Court*, 155 Wis. 2d 148, 156, 454 N.W.2d 792, 795 (1990); *see also Mallow v. Angove*, 148 Wis. 2d 324, 331, 434 N.W.2d 839, 842 (Ct. App. 1988) ("The primary source of statutory construction is the language of the statute itself . . . ."). Accordingly, we "owe no deference to LIRC's interpretation" of § 102.52(1), STATS., and WIS. ADM. CODE § IND 80.32(7). *See GTC Auto Parts v. LIRC*, 184 Wis. 2d 450, 460, 516 N.W.2d 393, 397-98 (1994).

## DECISION

The Worker's Compensation Act was first enacted in 1911. Laws of 1911, ch. 50. In 1913, the legislature established a system of scheduled compensation; what is now § 102.52(1), STATS., was enacted by Laws of 1913, ch. 599. Two years later, the Wisconsin Supreme Court decided *Northwestern Fuel Co. v. Industrial Comm'n*, 161 Wis. 450, 152 N.W. 856 (1915). The court reviewed the system of scheduled compensation in § 102.52 [then § 2394-9, STATS.], and made the following comments regarding the "conceptual tidiness"

which is essential to the scheduled-injury approach: "The fact that the schedule so specifically fixes the precise injury for which compensation is allowed, excludes the idea that the schedule covers any other or different injury." 161 Wis. at 456, 152 N.W. at 857. Clearly, the supreme court refused to grant the Industrial Commission (now LIRC) the authority to give an expansive reading to the schedule. *Northwestern Fuel* remains good law. In fact, the court's conclusion as to the legislature's purpose in prescribing scheduled injuries is as sound today as it was in 1915: "It seems from the whole act that the purpose of the legislature was to confine the fixed compensation named in the schedule . . . to the specific injuries named therein." *Id.*

Hagen's complaints, supported by the medical evidence, clearly detail an injury to her right shoulder. The employer concedes in its brief that Hagen suffered a shoulder injury: "[U]ntil the schedule is amended, *shoulder injuries such as that sustained by appellant* will be correctly considered scheduled." (Emphasis added.) However, in its June 20, 1990 letter to Hagen's attorney, the employer's insurer admitted that its "independent medical evaluation" of Hagen described her injury as "3% for the body as a whole." The employer's doctor, Dr. Varia, conducted this evaluation and concluded: "In view of her persistent difficulties and painful range of motion at the right shoulder, I rate her permanent partial disability as 3% compared to the total body as a whole in view of her myofascial pain symptoms." Plainly, Dr. Varia not only described a shoulder injury, but also described an unscheduled injury. Consistent with these findings, LIRC found: "There is no doubt that [Hagen's] problem not only involves her 'arm' but, in addition, her 'shoulder.' "

58

However, after crediting the medical testimony and evidence outlined above, the ALJ surprisingly concluded: "When physicians describe an injury in such a fashion, it is clearly a scheduled injury. . . . It is found therefore that *the applicant's shoulder injury* is scheduled . . . ." (Emphasis added.) In explanation of his decision, the ALJ merely stated: "Where the surgery took place was so very close to where the humerus joins the scapula and the clavicle . . . it makes no sense to label a nonscheduled injury." LIRC adopted the ALJ's construction of the statute. The question on appeal, therefore, is whether LIRC's interpretation of § 102.52(1), STATS.—that a shoulder injury constitutes "[t]he loss of an arm at the shoulder"—can be reasonably justified by looking to the plain language of the statute.

We interpret words in a statute "according to their common and approved usage." *Barnes v. DNR*, 178 Wis. 2d 290, 307, 506 N.W.2d 155, 163 (Ct. App. 1993) ("We may resort to a dictionary for this purpose."), *aff'd*, 184 Wis. 2d 645, 516 N.W.2d 730 (1994). Subsection (1) of § 102.52, STATS., refers to "[t]he loss of an arm"; that part of the statute simply refers to the "act of losing" an arm or the act of "separating" the arm from the rest of the body. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1338 (1993). Clearly, § 102.52(1) encompasses an injury to the arm and not to the shoulder. The legislature specifically used the language "loss of an arm," and not the language "loss of a shoulder."

The phrase in sub. (1)—"at the shoulder"—merely identifies the location where the "arm" is "lost" or "separated." This reading of the statute is consistent with a common-sensical interpretation of § 102.52, STATS., in its entirety. *See Pulsfus Poultry Farms, Inc. v. Town of Leeds*, 149 Wis. 2d 797, 804, 440 N.W.2d 329, 332

(1989) ("In construing a statute, the entire section and related sections are to be considered in its construction or interpretation."). Section 102.52(3)—"[t]he loss of a hand"—is conceptually identical to "[t]he loss of an arm." However, the legislature did not identify the location where the hand is lost because it is apparent that the hand, if injured, is lost at the wrist. However, an arm can be lost at more than one location. Section 102.52 furthers the "conceptual tidiness" of the scheduled-injury approach in sub. (1) which schedules "[t]he loss of an arm *at the shoulder*," and sub. (2) which schedules "[t]he loss of an arm *at the elbow*." (Emphasis added.) "[A]t the shoulder" simply identifies the location at which the arm is lost. Accordingly, § 102.52(1) cannot reasonably be read to include "[t]he loss of a shoulder," but can only be read as including what its language dictates—"[t]he loss of an arm."

LIRC contends that the phrase "at the shoulder" brings shoulder injuries within the scope of § 102.52(1), STATS. We reject this contention. In essence, respondents are contending that "[t]he loss of an arm *at the shoulder*" should be read as "[t]he loss of an arm *and the shoulder*." LIRC's expansive reading of the schedule deprives injured workers of the compensation the legislature intended them to have. If the compensation schedule is to be amended, it is the legislature's function to do so, not LIRC's or this court's.

LIRC also claims that WIS. ADM. CODE § IND 80.32(7)'s reference to "shoulder" supports its decision. Section 80.32 covers a variety of injuries, both scheduled and unscheduled. For example, sub. (11) specifically addresses "back" injuries, which are clearly unscheduled injuries. Thus, the fact that sub. (7) of § 80.32 addresses "shoulder" injuries is not persuasive.

We hold, therefore, that while Hagen's arm injury is scheduled as "[t]he loss of an arm," the plain language of the statute makes clear that shoulder injuries are *not* scheduled. The finding of a scheduled injury to the arm does not preclude the finding of an unscheduled injury to the shoulder; in other words, the two findings are not mutually exclusive. Larson agrees. "[T]he schedule is not exclusive if the effects of the injury extend to other parts of the body." 1C LARSON, WORKMEN'S COMPENSATION LAW § 58.00 (1995). In his treatise, Larson further states:

> The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive. A common example of the kind of decision is that in which an amputation of a leg causes pain shooting into the rest of the body, general debility, stiffening of the hip socket, or other extended effects resulting in greater interference with ability to work than would be expected from a simple and uncomplicated loss of the leg.

*Id.* at § 58.21 (footnotes omitted). Likewise, an impairment of the use of one's shoulder represents more than just "a simple and uncomplicated loss" of one's arm.

Our reading of § 102.52(1), STATS., is consistent with decisions from other jurisdictions. While LIRC argues that these decisions are inapposite because of the differences in the language of the statutes, we consider them persuasive because they construe statutes using the scheduled-injury approach. That approach is followed in most worker's compensation statutes. *See* 1C LARSON, § 58.00. In *Safeway Stores, Inc. v. Industrial Comm'n*, 558 P.2d 971 (Ariz. Ct. App. 1976), the

court found that "shoulder injury" constituted an unscheduled injury rather than a scheduled injury under ARIZ. REV. STAT. ANN. § 23-1044(B)(13) ("the loss of a major arm"). The court first noted that the location of claimant's pain and injury was his shoulder and not his arm. *Id.* at 973. The Arizona court stated: "The shoulder is a distinct anatomical entity in medical, legal, and lay understanding. It makes little sense to disregard this distinct entity for purposes of workmen's compensation awards." *Id.* at 974. The court concluded: "[T]he shoulder is not part of the arm and where the injury is to the shoulder it is not proper to base the award on the proportionate loss to the use of the arm." *Id.* (quoting *M.R. Thomason & Assoc. v. Jones*, 261 So. 2d 899, 902 (Ala. Civ. App. 1972)).

The court in *Hannan v. Good Samaritan Hosp.*, 476 P.2d 931 (Or. Ct. App. 1970), reached a similar result. The court acknowledged that the indirect result of a shoulder injury was partial loss of the use of the left arm. *Id.* at 932. Concluding that the injury was not scheduled under OR. REV. STAT. § 656.214(2)(a) ("the loss of one arm . . . above the elbow joint"), the Oregon court stated: "The arm itself was not injured. The injury resulted in little or no pain in the arm itself. The stiffness and pain were in the shoulder. *For all practical purposes the loss of use of the arm was due solely to the inability to manipulate the shoulder.*" 476 P.2d at 932 (emphasis added).

Two Missouri decisions, which are based on statutory language virtually identical to Wisconsin's—"the loss of the minor arm at the shoulder"—also held that "shoulder injuries" do not equate with injuries to the arm, and are therefore unscheduled injuries. *See Haggard v. Synder Constr. Co.*, 479 S.W.2d 142 (Mo. Ct.

App. 1972); *Bumpus v. Massman Constr. Co.*, 145 S.W.2d 458 (Mo. Ct. App. 1940).

Finally, in *Lauhoff Grain Co. v. McIntosh*, the court found that "[a] 'leg,' under the general understanding of the word, simply does not include a hip." 395 N.W.2d at 839. The court ruled:

> [T]he impairment of body functions in this case were in the hip, not the leg, and we will not consider these functions to be coextensive merely because the hip function impacts on that of the leg. To do so would extend the application of [the statute[6]] beyond its express terms by applying it to a body member not expressly included. *The result would be a rupturing of the conceptual tidiness which is said to be the very essence of the scheduled-injury approach.*

*Id.* at 840 (emphasis added).

LIRC's construction of § 102.52(1), STATS., is an unwarranted departure from the "conceptual tidiness" which is the essence of the scheduled-injury approach. We reject it.

*By the Court.*—Order affirmed in part; reversed in part and cause remanded.

---

[6] IOWA CODE 85.34(2)(o) (1977), provides in part: "The loss of two-thirds of that part of a leg between the hip joint and the knee joint shall equal the loss of a leg . . . ."